Thank you, Your Honor, and happy St. Patrick's Day to all of you. This case raises a question which is frequently in this Court as to whether a grant of summary judgment was provident or improvident in light of the facts taken most favorably to the nonmoving party. There are two claims asserted here, one for a hostile environment and the other for constructive discharge. There are several clusters of events which predicate the claims. The first relates to what are called assignments. The second relate to partners, and the third relates to a parolee named A.R. and how my client was treated after threats were made against her life by A.R. My client indicates that, and I think the record supports, that assignments were made by Davis. Davis is the bureau chief, or otherwise called B.C. My client indicates from the beginning that the assignments were skewed and that she received more assignments than African-American individuals who were in the same category that she was. However, she doesn't have precise information about the assignments, nor did Davis. When questioned at deposition with regard to the assignment patterns, Davis said she did not maintain records with regard to assignments. My client said that there were general conversations about assignments. She didn't know where each person was assigned, but she understood she had three precincts assigned to her, which was distinct. I mean, I guess I'm raising an issue which I think you're obviously aware of, which is the discrepancy between the deposition testimony and the declaration. And our case law is pretty clear that where there's a discrepancy or a contradiction, you're locked into your deposition testimony. So the deposition was two precincts that she had, right? Yes. But I don't think the case law is as locked in as the Court suggests. We did brief the issue under the sham affidavit theory which Judge Karas adopted and which we repudiate in this case. I believe that it creates a credibility issue, and I think the case law indicates that, that the deposition should be understood as usable. Of course, it is to impeach should she testify differently, but she can provide an explanation.  Even if you take the version of deposition, it's not really usable. There's no evidence from which a jury could rationally conclude that she was, on assignments, that she was treated differently than non-Caucasian employees. I mean, I understand maybe there were no records, but you have to have something more than her just saying it, right? I don't agree there's no evidence. I'm not arguing there's a strong assertion. There's a farewell card from another employee saying, yeah, that was a nightmare. But you think a jury could find race discrimination based on that? Well, again, I think that race discrimination is not based on one factor or the other. I think it is cumulative, and I don't think that alone would lead to that conclusion. If you proposed another officer who was not Caucasian and found out what the assignment was, if hers was so disproportionate, even with no records, somehow you could have proved that, right? Well, I think my client's ---- You could have deposed the officer who wrote the card, and we would know what that card meant. Well, I think what the card means is discernible, frankly. I don't think Judge Karas understood the card in the manner in which a reasonable jury could understand it. It's clear that the card was indicating that my client had nightmarish assignments and had three precincts. I mean, I don't think that's subject to dispute. Well, that means that it doesn't mean it was any worse than anybody else's. It was just, you know, it's a tough job. Okay. Well, again, moving on from assignments to partners, I think the issue with regard to partners is clear, as I see the record. But I understand the partners were just ---- that was worked out between the officers, and so it wasn't ---- they were not assignments to partners. No, the ---- I mean, again, the record is ---- Am I wrong on that, or is that ---- I think you're ---- I don't want to say you're wrong on it, but I think the record is clear that the partners were not assignments to partners. They were partners who were covering for the individual full-time when that individual had other assignments and, according to my client, were going out into the field with each other. And that, in fact, when she made inquiries of African-American individuals to partner with her, she ended up covering for the individual full-time when that  indicated the response, not that you don't partner, but that wear a hat, get a tan, you're a snow cone, et cetera. So my feeling is, on the record, there's clear enough evidence that Davis suggests that Johnson was in charge of assigning partners, and that is in the record and clear. Wait a second. Hold on. Yes. In her deposition, it was asked, is there a general practice in the Brooklyn Bureau to have an individual parole officer go into the field with another parole officer? Is that your general practice? This is who, Johnson? This is Davis. And she said, no, it's up to the parole officer. It was pretty consistent in the depositions that it's up to the parole officers to find someone, if they want to, to go out with them. There's no evidence that everybody got assigned a particular officer by either Davis or Johnson.  At JA 327 and 328, Davis says that all parole officers have an assigned partner. I know she would have had a partner. Who a partner was at that time, I don't know. A parole officer can be assigned one partner, but go out in the field with someone else. So I believe that's indicative of the testimony I cite. I believe the testimony is that there were no training. There's office partners, field training partners, but the dispute was about partners who would go with her into the field. Well, again, I think that latter distinction regarding the partners who would go in the field, as opposed to, quote, office partners, is not a real distinction. I think those are the partners who would go with the officers into the field. And that was my client's testimony. So we get to the ---- The more fundamental problem on that, Mr. Sessom, is those two remarks that you referenced were never told to either Johnson or Davis. They didn't know of either of those remarks by the ---- I agree. All right. So how can that be attributed to them? And also, your client testified, I know you tried to reply to explain this, but she was asked how many times did you raise this issue of treatment, and she raised it one time. I don't believe that's accurate, J-219. She went through the one incident where they were upset at her, and then this is on 23, where your client is asked, did you report anything else to SPO Johnson regarding any treatment you received from the other parole officers? Answer, I did not. That's a different ---- I agree, but that's a different issue. With regard to the partner issue at 219, J-219, she says, when I would go to SPO Johnson for a partner to go into an area that was, you know, not safe, she would say, okay, there are other ---- there are these other two parole officers I have to ask. I did. They were so angry. I had to go with them. So she made a ---- She describes one incident, and they ask her, were there any other ones? And she said no. So I don't understand how you think that could be read any other way. Because the initial testimony regarding I would go doesn't refer to one incident. It refers to a pattern of behavior by Johnson. And Johnson was responsible, according to Davis, for assigning partners. The third incident, which, of course, is the real grotman of this case, relates to the parolee. I see I'm almost 24 seconds, but I'll quickly wrap up with this. And with regard to that, the basic argument is that there were standards that were to be applied in a situation like this, none of which were applied. The development of an action plan, taking the individual parole officer off the case of the individual who threatened him or her, creating safety situation, none of that was abided by, but showed to my client a devaluation of her so significant as to warrant the constructive discharge. Sotomayor, What's the connection between that and race discrimination? The basic argument here is that race discrimination can be inferred from a deviation from standards which are adopted by the agency. The agency had directives and plans as to how they were supposed to deal with a situation of this seriousness. With regard to her — I just have to show that the same thing would have happened, that it would have been treated differently if the person had been black. Again, under Arlington Heights, just to be clear, and I don't want to go too far over time, the argument is that deviation from standards undisturbed in Arlington Heights is itself sufficient. The argument is not that you have to have a comparator in that situation. There are distinct and discreet ways of proving discrimination. Here we're saying there were established patterns that obviously made sense, given the priority of safety, they were deviated from with regard to Ms. Reese. There's no comparable case that we have found, to answer your question, so we can't definitively know you're asking if an African-American would be treated differently. What we can know is that there were standards and they were deviated from with regard to my client. So any deviation from standards is indicia of race discrimination? Not — I would say the answer to that is not any. I would say that — I would say that — I would say that the nature of the deviation and the seriousness of the situation, it's something analogous to what you found in Carrero dealing with gender discrimination and sexual harassment. Not any touching, any — is going to be one incident sufficient to be sexual harassment. But if you have a serious enough incident and a deviation in that sort of situation, it could be so viewed. So I don't think any. But I think in this case where you have a requirement for an action plan, a requirement from Holland as he expressed it, that you move that person immediately. You don't do it. You then have conflicting testimony. Johnson saying, I did it, indicating she knew she should have. Davis saying, I did it with Davis's support. And Davis saying, no, I didn't support it. She couldn't do it because she had cases. When you have that kind of inconsistency over an issue of this importance, the deal with safety, yes, I think that would be enough to answer your question. Thank you, Mr. Sessom. We'll now hear from Ms. Barnett. Thank you. Good morning, Your Honors. And may it please the Court, Gillian Barnett for the state defendants. This court should affirm the district court's order granting defendants motion for summary judgment because Reese cannot establish a prima facie case of discrimination. There is no evidence in the record from which a reasonable jury could conclude that defendants Officer Davis or Officer Johnson subjected Reese to severe or pervasive intimidation, ridicule, or insults, let alone that they did so because Reese is white. Reese concedes that Davis and Johnson did not make any racially derogatory comments to her, nor were they informed that any such comments were made to Reese by others. There is also no circumstantial evidence of racial discrimination. There's no evidence that Davis or Johnson treated Reese any differently than they treated her non-white peers. As a preliminary matter, as this court was discussing, this court should disregard Reese's declaration, which was filed after our motion for summary judgment, and which contradicts. Disregard its totality, or just the parts that are contradicted by the deposition? Your Honor, I would be happy with either. I think it's full of contradictions, so I think you'd end up tossing the whole thing anyway. I mean, once you have a certain threshold of contradictions, you have to toss out the whole declaration. I believe so, Your Honor. But in this case, if you were to toss only the contradictions, summary judgment is still appropriate. And even if you were to accept the declaration in its entirety, summary judgment is still appropriate. There are no questions of fact as to disparate treatment with regard to caseload. Reese testified, even assuming what Reese said in her declaration is true, that she was assigned to cover parolees who lived within the boundaries of three different precincts. That is not a stat. And other officers had one or two precincts. How long was she working before she left? She left about, sorry. Less than six months, right? Yes, she was in training in Albany for two months, and then she was an actual parole officer in Brooklyn for three months when she left. But Reese, assuming that she did have more precincts assigned to her than other parole officers, that still sheds no light on whether or not she had more cases than other parole officers and whether her cases were of more difficulty than other parole officers. So there's really no evidence that she was treated differently with respect to her assignments. Is it accurate that there were no records to prove who had what assignments, how many? Mr. Sussman said yes in the deposition, and that either Davis or Brown said there are no such records. Is that accurate? Right. Officer Davis testified about a computer program they had used for assignments, and she said that she wouldn't have access to those records now. She's not she's no longer with the office anyway. And what about the point of who makes the assignments? Well, not who makes the assignments, but I'm talking now about the partnerships. The partnerships? My understanding was that the partners were sort of arrived at between parole officers. Yes, Your Honor, and I think that's the correct understanding. But without assignments. But maybe the evidence is a little opaque on that. You're talking about partners? Yeah. Yes, so Officer Johnson was primarily responsible for assigning partners. She testified that she would assign office partners, which those partners exist for if a parole officer is out in the field, but something arises on her caseload, her office partner can handle whatever arises. But that she would just encourage officers to go into the field with other officers, but not that doing so was required. And Reese herself testified when she was asked whether or not did Johnson assign these partners, or did parole officers obtain their own partner when they went out? This was on page 221. She said, quote, I don't know how they did it, but I know there was no partner for me. She further testified that she did go to Johnson once to ask her about, she said, I feel unsafe going to this area, what should I do? And Officer Johnson suggested, why don't you go ask these other two officers? She did, and those two officers accompanied her to that assignment. Finally, there is no issue of fact with regard to the office's response to AR, this parolee who had made threats against Reese. As soon as the threats came to Officer Johnson's attention, she took immediate action. She removed Reese from hospital duty. She sent two parole officers to replace her immediately. Reese came back to the office. They filled out an unusual incident report. Is there a dispute as to whether the actual protocols were all followed to the T? I mean, there was some response. Clearly, the record reflects that. But is there a dispute as to whether there were procedures and those procedures were followed? Your Honor, as to the majority of the directive, there is no issue of fact as to whether it was followed. There is one item in the directive that Reese points out about the requirement to come up with a safety plan. She says that one wasn't made, but I think the record shows that Officer Johnson and Davis took immediate and continuous action to make sure that she was protected in this situation. They also say there's a dispute about whether she should have been reassigned immediately. I think Davis or Brown, excuse me, Davis or Johnson said because it was a pending violation and she was in custody, she could not be reassigned. Is that a factual issue or not? I don't believe that's a factual issue because Reese has no personal knowledge as to the practice or policies with regard to reassignment. As Officer Davis testified, the practice is not to reassign if the parolee has made a threat but is currently incarcerated on a parole violation because then there's really no reason for the reassignment. And she also testified that regardless of a threat, the assigned parole officer would still have to testify at the hearing, at the parole violation hearing. So it just makes sense to keep that officer on the case. She had no physical contact with him after the hospital incident? Correct. She attended his violation hearing on July 19, but that was via video application. So she was never in a room with him again. And as soon as he was released from custody, shortly after the hearing in July, within a matter of days, the case was reassigned. If there are no further questions, we ask that this be confirmed. Thank you. All right. Thank you, Ms. Barnett. Mr. Sussman, you have two minutes for rebuttal. Just briefly, I think there was a concession that my client, on the record, according to Johnson, was not assigned, even though she was the one in charge of doing this, what she's calling office partners. Reese indicated that that was never disputed by Johnson, and there was no such assignment. So with regard to the partners, I think that point is actually conceded. With regard to the issue of AR, the deviations were not singular. On July 25, Holland, who is the investigator who is assigned to the case, the day after the serious threats, stated explicitly that my client should be reassigned from this case. She was not reassigned from the case, even though Johnson stated that within a few days she was, with Davis's approval. Davis testified she was not reassigned. Counsel explained her rationale, even though that rationale is contrary to the actual regulation that Holland cited as the basis for reassignment. No safety plan was developed, even though counsel, I felt, equivocated on that. None was developed. Reese was never assigned to one, never informed of one. And there could have been one. Regarding parking, we heard about the parking situation extensively. My client had an opportunity to be shown a parking spot which would be insulated. The idea that the gentleman was in the hospital and would have no contact with my client was not known to Reese and was not actually factual the entire period from the 24th to the 19th. In fact, on the 19th, the individual was released because Ms. Johnson had failed to follow protocol in filing the proper paperwork. And at that point, my client still was on the case for five more days. So a number of these issues do raise factual questions which are not resolved in the record favorably to me. On the summary judgment motion, they're resolved opposite. Thank you for your attention. Well, thank you. We have a reserved decision.